Kolin C. Tang (SBN 279834)
**SHEPHERD, FINKELMAN, MILLER**
 **& SHAH, LLP**
1401 Dove Street, Suite 540
Newport Beach, CA 92660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
ktang@sfmslaw.com

*Counsel for Plaintiffs, on behalf of themselves*
*and all others similarly situated*

[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

BILL SCHEPLER and ADRIAN
GARCIA, On Behalf of Themselves and
All Others Similarly Situated,

        Plaintiffs,

    v.

AMERICAN HONDA MOTOR CO.,
INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 2:18-cv-6043-GW-AFM

Assigned to: Hon. George H. Wu
Courtroom: 9D

**PLAINTIFFS' NOTICE OF**
**MOTION AND MOTION TO**
**LIMIT CONSIDERATION OF**
**THE EXPERT REPORT OF**
**DOUGLAS YOUNG, PH.D.;**
**MEMORANDUM OF POINTS**
**AND AUTHORITIES**

Date:  October 1, 2020
Time:  8:30am
Place:  United States Courthouse
       350 West 1st Street
       Los Angeles, CA 90012
       Courtroom 9D, 9th Floor

## NOTICE OF MOTION AND MOTION TO LIMIT CONSIDERATION TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT ON October 1, 2020, at 8:30 AM, in Courtroom 9D of the United States District Court for the Central District of California, before the Honorable George H. Wu, Plaintiffs, Bill Schepler and Adrian Garcia (collectively, "Plaintiffs"), will, and hereby do, move the Court to limit its consideration of the report and testimony of Douglas Young, Ph.D ("Dr. Young") in connection with their Motion for Class Certification ("Mot. for Class Cert.").

Pursuant to Ninth Circuit authority set forth in *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006-07 (9th Cir. 2018), the Court does not determine admissibility at the class certification stage. As such, Plaintiffs only ask the Court to afford little or no weight to Dr. Young's conclusions and opinions because they fail to satisfy the standard of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

The Court need not grant this Motion in order to grant class certification. Because Defendant, American Honda Motor Co. Inc. ("Defendant" or "AHM") offers Dr. Young's opinions and report (Pl. Ex. WW (also filed at Dkt. No. 91-5) (Report of Douglas Young, Ph.D. dated June 11, 2020) ("Pl. Ex. WW")) in support of its Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (Dkt. No. 93) ("Opposition"), its Motion for Summary Judgment on Plaintiff Adrian Garcia's Claims (Dkt. No. 91-3) ("MSJ"), and its Motion to Exclude the Report and Testimony of Gary Whitman (Dkt. No. 91-2) ("MTE Whitman"), the Court should consider the relevant *Daubert* factors and afford Dr. Young's opinions no weight.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs only move at this time with respect to Dr. Young's opinions that are referenced in AHM's Opposition, MSJ, and MTE Whitman, and reserve the right to seek exclusion of all of Dr. Young's opinions prior to trial.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on July 30, 2020 via teleconference.  Defendant opposes this Motion.

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D.  CASE NO. 8:15-cv-01985 CAS (Ex)

2

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION TO LIMIT CONSIDERATION ...............i

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ...........................................................................1

BACKGROUND .............................................................................2

I.  Dr. Young's Studies and Data ..............................................3

LEGAL STANDARD.......................................................................7

ARGUMENT ................................................................................9

I.     Dr. Young's Conclusions Are Not Reliable and Ignore the Actual
       Data He Collected .............................................................9

II.   Certain of Dr. Young's Conclusions Are Irrelevant Because They
       Do Not Pertain To Plaintiffs' Theory Of The Case ..........................14

CONCLUSION .............................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cabrera v. Cordia Corp.,*
   134 F.3d 1418 (9th Cir. 1998) ...............................................................12

*Daubert v. Merrell Dow Pharm., Inc.,*
   4 F.3d 1311 (9th Cir. 1995) ...................................................................8

*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579 (1993).................................................................i, 7, 8

*Estate of Barabin v. AstenJohnson, Inc.,*
   740 F.3d 457 (9th Cir. 2014) .............................................................8, 9

*Gonzalez v. Harley-Davidson Motor Co.,*
   2005 WL 8160757 (D. Ariz. Aug. 23, 2005)....................................................11

*Graves v. Mazda Motor Corp.,*
   675 F. Supp. 2d 1082, 1103 (W.D. Okla. 2009)................................................16

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)...........................................................................8

*Lust ex rel. Lust v. Merrell Dow Pharms. Inc.,*
   89 F.3d 594 (9th Cir. 1996) ................................................................12

*Sali v. Corona Reg'l Med. Ctr.,*
   909 F.3d 996 (9th Cir. 2018) .............................................................i, 8

*United States v. Hankey,*
   203 F.3d 1160 (9th Cir. 2007) ...............................................................8

**Rules**

Fed. R. Evid. 702 ....................................................................i, 8

# INTRODUCTION

Plaintiffs' theory of this case is that the rear seat belt configuration of the 2017-2018 Honda CR-V ("Class Vehicle(s)" or "CR-V(s)") is defective, unsafe, and, thus, cannot safely seat three passengers, with or without child safety seats. Pl. Mot. for Class Cert., Dkt. No. 81, at 3. Plaintiffs' expert, Gary R. Whitman ("Whitman"), used the same methodology to conclude that there was a defect in the rear seat design that AHM's expert, William W. Van Arsdell, Ph. D., P.E. ("Dr. Van Arsdell"), used to come to the opposite conclusion. In so doing, Dr. Van Arsdell did not rely on any qualitative standards, test any components, or rely on Dr. Young's Report.

AHM apparently hired Dr. Young separately to provide an independent basis to contradict Whitman's conclusions. So, Dr. Young invented a test procedure that was designed for one thing—to arrive at the predetermined conclusion that the CR-V's rear seat belt configuration is not defective and not unsafe. Dr. Young's first-of-its-kind study purportedly measured the time it takes to buckle and unbuckle a seat belt in various scenarios and evaluated the "handling strategies" and "visual behavior" of the participants during the buckling and unbuckling process. He then applied that quantitative and qualitative "data," which were both subjectively recorded, as discussed below, to an unintelligible metric (as a proxy for a non-existent standard), upon which Dr. Young predictably concludes that "[t]he design characteristics of the rear center and outboard seat belt restraints of the subject CR-V do not create delays or safety concerns related to handling, buckling, or unbuckling for adult occupants." Pl. Ex. WW at 26.

In so doing, Dr. Young not only failed to use reliable and scientific methods, but he also ignored the implications of the questionable timing data that he recorded. Ironically, the timing data, to the extent it can even be relied upon, actually validates Plaintiffs' theory that the rear seat belt configuration is unsafe.

As such, in addition to his methodological problems, Dr. Young's conclusions are either irrelevant, unsupported, or based on arbitrary benchmarks. Because each of Dr. Young's conclusions is unreliable, irrelevant, or both, the Court should afford little or no weight to his Report and testimony.

## **BACKGROUND**

AHM retained Dr. Young to "analyze and evaluate the human factors and human performance issues" in this case. Pl. Ex. WW at 2. Dr. Young described "human factors" in his deposition as "traditionally . . . man-machine interactions . . . including those that occur in everyday situations." Pl. Ex. QQ (Deposition of Douglas J. Young) at 33:17-24. Not surprisingly, then, Dr. Young is not "an expert in seat belt safety." *Id.* at 24:3-13. Although he has received compensation from nearly every automobile company in the country (*id.* at 14:5-15:24), he is also not an expert in seat belt or automotive design, Federal Motor Vehicle Safety Standards ("FMVSS"), or National Highway Traffic Safety Administration standards. *Id.* at 23:4-27:3; 89:6-10. Further, Dr. Young has never "designed and implemented a study that was specifically intended to measure timing differentials with respect to buckling and unbuckling seat belts as between a specific vehicle and comparator vehicles." *Id.* at 50:2-9. Dr. Young did not rely on any of Honda's[1] usability studies, did not utilize any field data (such as information about how Plaintiffs and Class members described their problems with the safety of the configuration and its usability), did not use FMVSS or other guidelines, and did not consider inadvertent release, emergency conditions, or children seated in the

---

[1] "Honda," as used herein, refers to AHM's Japanese parent company, Honda Motor Company, Ltd.

CR-V. *Id.* at 55:8-23; 58:21-25; 66:8-67:7; 73:4-25; 92:6-94:23.[2]

## I.     Dr. Young's Studies and Data

Dr. Young performed certain studies, the results of which he included in his Report. The first study, in addition to the 2017 Honda CR-V, included the 2017 Nissan Rogue, 2017 Toyota RAV4, and 2018 Subaru Forester. In his second study, Dr. Young included two additional vehicles, a 2017 Ford Escape and 2017 Chevrolet Equinox. Each of the vehicles, except for the Subaru Forester and Ford Escape, incorporated center rear seat belts that crossed over an outboard seat belt, similar to the CR-V.

Dr. Young had the participants enter the vehicle and don and doff the left rear seat belt. In Study 1, this was done under three conditions: (1) nothing occupying the center occupant position; (2) an adult dummy in the center rear occupant position, wearing the center rear lap/shoulder belt; and (3) a child restraint secured in the center rear occupant position. Study 2, which involved only three participants, was performed under two conditions: (1) nothing occupying the center occupant position; and (2) an adult dummy in the center rear occupant position, wearing the center rear lap/shoulder belt.

Each of the vehicles was set up with three GoPro cameras, one of which was mounted inside on the roof to capture the entirety of the rear seat, a second that was mounted to the front driver's seat to capture the driver's side of the rear seat, and a third that was mounted to the front passenger's seat to capture the passenger's side of the rear seat. Pl. Ex. WW at 14. The timing measurements presented in Dr. Young's Report were based on two research assistants viewing the GoPro footage (although it is not clear which camera or cameras they viewed),

---

[2] In fact, according to his Report, Dr. Young relied on just the operative complaint, class certification briefing, Plaintiffs' expert's reports, and depositions of Whitman and Honda's representative, Makoto Tsurata. Pl. Ex. WW at 4.

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D. CASE NO. 8:15-cv-01985 CAS (Ex)

3

listening for the buckling and unbuckling "clicks," and documenting the time of the "clicks" to the nearest whole second (the GoPro cameras did not account for tenths of seconds, for example). Pl. Ex. QQ at 108:18-109:8. The two individuals were intended to serve as a cross-check for one another, and when they disagreed, instead of averaging the times they respectively noted, they had a discussion about their differences until they could come to a resolution, which discussion was unrecorded. *Id.* at 113:15-114:11. Dr. Young posited that this was "[s]tandard practice with regard to video analyses," but did not point to any academic or scientific literature demonstrating this methodology. *Id.* at 114:12-23. Further, Dr. Young could not point to any FMVSS guidance, SAE guidelines, or any specific academic or scientific literature where this method of time measurement was utilized. *Id.* at 101:3-102:23.

Each study participant was allowed practice trials—an opportunity to practice buckling and unbuckling the seat belts at each seating position of each vehicle. Pl. Ex. WW at 15; Pl. Ex. QQ at 86:2-24; 102:25-104:24. These practice trials were not captured by the GoPro cameras, the timing of these trials was not measured or reported, and the timing of these trials was not factored into the averages that Dr. Young presents in his Report. *Id.* at 103:15-24. In requiring his participants to practice buckling and unbuckling the seat belts at each rear seating position in each vehicle before the cameras began rolling, Dr. Young admittedly ignored "the extent to which extended trials and practice would change performance outcomes." *Id.* at 88:6-18.

Dr. Young then reported the average times, excluding the practice trials, that it took participants to buckle and unbuckle the rear outboard seat on the same side as the rear center seat shoulder strap across all vehicles for when the rear center seat was empty, contained a dummy, or contained a car seat. Pl. Ex. WW at 16-17 (Table 1). Dr. Young's data show that for ***all of the vehicles with crossed-***

***belt configurations, it took participants longer to buckle and unbuckle*** their seat belts when the rear center seat was occupied compared to when the rear center seat was empty.  *Id.*  Further, the data show that it took longer, on average, for participants to buckle and unbuckle in every vehicle with crossed-belt configurations compared to the vehicle with an uncrossed-belt configuration.  *Id.*; *see also* Pl. Ex. II ¶¶ 10-12.

Notably, the data shows that in the Subaru Forester, which has the uncrossed-belt configuration, it took an average participant approximately 13% longer to buckle when there is an occupant in the middle seat compared to when the middle seat is empty.  By contrast, the data showed that in the CR-V, which has the crossed buckles at issue in this action, it took an average participant ***71%*** longer to buckle when the middle seat was occupied compared to when the middle seat was empty.  Pl. Ex. QQ at 115:4-118:13; Pl. Ex. II ¶ 10.  Likewise, the difference between buckling with an empty middle seat versus a child seat in a Forester was approximately 11%, while the difference for the CR-V was ***91%***.  Pl. Ex. QQ at 123:15-125:15.  Similarly, the data from Study 2 shows that, on average, it took participants in the vehicles with crossed-belt configurations (like the CR-V) longer to buckle and unbuckle their seats when the rear center position was occupied by a dummy than it did in the vehicles with uncrossed-belt configurations.  Pl. Ex. WW at 19-20; *see also* Pl. Ex. II ¶¶ 10-12.

Dr. Young admitted that the increased times are "more apparent for the four vehicles that have crossover designs relative to the Forester, which does not."  Pl. Ex. QQ at 125:6-8.  However, he insisted that this significant percentage increase was not a "material difference."  *See id.* at 124:19-126:23. When asked what metric, standard, test, or analysis he employed in determining whether timing differentials constituted a "material difference," Dr. Young could not articulate anything meaningful, but instead, provided the following non-explanation:

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D.  CASE NO. 8:15-cv-01985 CAS (Ex)

5

I would say the following: That this study evaluates the ease of use of the buckle systems that are in a variety of vehicles; vehicles that have similarities and differences, vehicles that are those that have been purchased quite a bit by the general motoring public. In fact, I believe these are the highest-selling vehicles for the most part in this class, and that the handling of these seat belts are essentially the same across the design characteristics when you consider the ways in which individuals buckle and unbuckle their belts, how they handle the belts, what they're doing in terms of moving their limbs in certain ways, what they're doing in terms of where they're looking. And when you have these things taken together, what you see is that these designs don't affect ease of use. And more specifically with regard to handling in terms of emergency situations, I wouldn't see any differences from the observations I've made from when one individual leans left from the center position over to the left rear occupant position.

*Id.* at 131:2-24.  In other words, Dr. Young was unable to identify any actual metric whereby a timing differential would constitute a "material difference," in terms of buckling or unbuckling a seat belt, while insisting that the significant percentage differences in the timing, other than on their face, were not a "material difference."

Seemingly unrelated to Studies 1 and 2, Dr. Young also conducted an observational "surrogate evaluation," but did not quantify the data in any way—it was not videotaped, there was no measurement of timing to buckle or unbuckle, and there was no data reported.  *Id.* at 132:4-134:4.[3]  Without *any* standard or data

---

[3] Surrogates 1 and 2 sat in the CR-V, Rogue, Forester, and RAV4, and Surrogates 3 and 4 sat in the Escape and the Equinox.  Pl. Ex. WW at 20-21.  With both sets of surrogates, he placed one surrogate in the rear driver's side position, one surrogate in the rear center position, and then a dummy in the rear passenger's position.  *Id.*  He then had the surrogates buckle their seat belts, and the rear center surrogates leaned forward and to the left, on to the surrogates in the rear driver's side position.  *Id.*  The surrogates in the rear driver's side position then unbuckled their seat belt and exited the vehicle.  *Id.*  The surrogates then switched positions and repeated the process.  *Id.*

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D. CASE NO. 8:15-cv-01985 CAS (Ex)

6

to support his claims, Dr. Young opines that he "observed no appreciable differences in buckling and unbuckling for the rear outboard surrogates in any of the six vehicles when the center passenger was leaning in their direction."  Pl. Ex. WW at 21.

Dr. Young also included in his Report various "human factors analyses" based on handling of the seat belts, gazing, variability, and other factors that he contends somehow impact how long it may take a user to buckle or unbuckle a seat belt.  *See* Pl. Ex. WW at 12-13 (explaining some "seat belt fastening behaviors"); *id.* at 22-25.  However, Dr. Young failed to explain why variations in hand placement (Figures B4, B5, B6) or gaze direction (Figures B7, B8, B9) support his conclusions.  These "human factors" are only material to the inquiry being tested if they have an impact on how quickly or slowly a participant was able to buckle or unbuckle their seat belt, ***which would already have been reflected in the time it took each individual to do so***.  Dr. Young couches his conclusions in terms of the times it took to buckle and unbuckle, and not in terms of these irrelevant observations (Pl. Ex. WW at 18-19). although he was not able to clearly identify a metric to measure what would qualify as a "material difference" between different vehicles' average buckling and unbuckling times.

## LEGAL STANDARD

Under Ninth Circuit law, the Court may not make determinations of admissibility or inadmissibility under *Daubert* at the class certification stage. The Court should, however, consider the *Daubert* factors and give no weight to Dr. Young's opinions, certain of which are irrelevant and all of which are unreliable, given that they are based on untested assumptions and deeply flawed methodology.

The Ninth Circuit explained that, with respect to admissibility of expert testimony in connection with class certification:

---

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D.  CASE NO. 8:15-cv-01985 CAS (Ex)

7

> [I]n evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*. *Ellis*, 657 F.3d at 982. ***But admissibility must not be dispositive***. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage.

*Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006-07 (9th Cir. 2018) (emphasis added).

Expert testimony must be both relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) ("[T]he Rules of Evidence— especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (noting that Rule 702 "imposes a special obligation upon a trial judge to ensure that any and all scientific [and expert] testimony . . . is not only relevant, but reliable").  But, "scientific expert testimony carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.' . . . Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert v. Merrell Dow Pharm., Inc.*, 4 F.3d 1311, 1319 (9th Cir. 1995) (quoting *Daubert*, 509 U.S. at 595).

There is no exhaustive list of factors by which judges determine the reliability of expert testimony.  "Many factors will bear on the inquiry," and courts have not "set out a definitive checklist or test." *Daubert*, 509 U.S. at 593; *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citing *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2007)).  However, the "soundness of [an expert's] methodology" is crucial in keeping with reliability standards.

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D.  CASE NO. 8:15-cv-01985 CAS (Ex)

8

*Estate of Barabin*, 740 F.3d at 463.

## ARGUMENT

In addition to creating his own unintelligible standard to reach his predetermined conclusion consistent with AHM's safety expert, Dr. Van Arsdell, Dr. Young's conclusions that "[t]he design characteristics of the rear center and outboard seat belt restraints of the subject Honda CR-V do not create delays or safety concerns related to handling, buckling, or unbuckling for adult occupants" are unreliable, contain grave methodological deficiencies, and ignore the actual data. Further, certain of Dr. Young's opinions are irrelevant. For all of these reasons, his opinions should be given limited weight.

### I.  Dr. Young's Conclusions Are Not Reliable and Ignore the Actual Data He Collected

Dr. Young can point to no industry or scientific standard to support his testing of the time it takes to buckle and unbuckle seat belts. Moreover, although he opined that there was no evidence that the buckling and unbuckling time was any different between the CR-V and any other vehicles based on his studies, which he created out of whole cloth, Dr. Young struggled mightily to actually define the standard:

> Q. What was the standard that you were implying in connection with your studies to determine whether or not, or what was going to be deemed to be material?
>
> A. I would say the data tells us that the interactions of individuals with the CR-V restraints is not substantially different from other vehicles. So based on the data set that we've collected that involves peer vehicles, we can clearly see that the CR-V is typical of that group and not atypical in any way.
>
> \*     \*     \*
>
> Q. Okay And with respect to the timing aspect, did you have a

---

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D.  CASE NO. 8:15-cv-01985 CAS (Ex)

predetermined metric for differential and timing that you believed was going -- that you were going to utilize in connection with timing -- just timing differential being material versus timing differential being not material?

A.   I had no a prior value in mind.

Q.   Okay.  So the metric was then just for materiality regarding the timing differential was going -- was -- is subjective?

A.   Well, it's based on the data set that we found with this data collection process. And really it's based on the distribution of times that we collected across the various vehicles for all subjects included.

Q.  So as you sit here today, can you tell me, other than subjectively, what the metric for timing differential would have been that would have resulted in you determining that it was material?

A. Depends, right…

Pl. Ex. QQ at 60:18-61:3; 61:20-63:11.

In addition to being unable to articulate the standard he used, Dr. Young's conclusions contain numerous methodological deficiencies, all of which support limiting the opinion.

First, the averages reported in Dr. Young's Report do not reflect real-world conditions.  The participants were given practice trials that were not captured by the GoPro cameras, the timing of these trials was not measured or reported, and the timing of these trials was not factored into the averages that Dr. Young presented in his Report.  *Id.* at 103:15-24.  It seems apparent that, the more often participants practiced buckling and unbuckling, the more adept they would become at buckling and unbuckling within the finite period of time of the study.  The results, then, do not account for any user of the vehicles that may be using the seat belts for the first time ever or even for the first time in a while.  But when presented with that concern, Dr. Young merely explained that he "didn't really look at the extent to which extended trials and practice would change performance outcome." *Id.* at

88:6-18.  Nor can anyone reviewing Dr. Young's Report or data draw a conclusion about whether trials and practice would change performance outcome, because Dr. Young did not videotape the trials or attempt to measure the buckling and unbuckling times of those trials.  *See Gonzalez v. Harley-Davidson Motor Co.*, No. CV-04-0023-PHX-NVW, 2005 WL 8160757, at *2 (D. Ariz. Aug. 23, 2005) (findings in part that expert's failure to quantify results from trial runs rendered opinion unreliable).  This gross oversight (if not purposeful manipulation of data) limits the reliability of the data.

Second, the method of measuring the time Dr. Young used was not grounded in any academic or scientific literature.  He set up GoPro cameras in each of the vehicles, which displayed time to the nearest whole second (as opposed to tenths of seconds), and videotaped the participants buckling and unbuckling the seat belts at various seating positions.  Dr. Young did not refer to the FMVSS guidelines, SAE guidelines, or point to any specific academic or scientific literature for his decision to gather data this way.  Pl. Ex. QQ at 100:17-103:14.

He then had two research assistants review the video, listen for the buckling and unbuckling "clicks," and then document the time they heard the "clicks" in order to calculate the average times he presented in Tables 1 and 2.  Pl. Ex. WW, at 17, 20; Pl. Ex. QQ at 108:18-109:8.  The research assistants were to serve as a cross-check for one another, but there are no notes or records of any method of handling disagreements on time measurements, other than that they simply discussed their differences until they came to a resolution.  Pl. Ex. QQ at 113:15-114:4.  Dr. Young does not account for the rate of error, but it would likely be significant, given that measurement of the "clicks" is based purely on a human's ability to hear the audio and stop the video, at the precise moment the "click" is heard, and that the video rounds to the nearest whole second.  Instead of pointing to any academic or scientific literature for this methodology for collecting and

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D.  CASE NO. 8:15-cv-01985 CAS (Ex)

11

analyzing data, Dr. Young vaguely explained that this protocol was derived from "standard practice with regard to video analyses and ensuring that these types of methodologies represent the kinds of measurements that are obtained in an accurate way." *Id.* 114:12-23.

It is not surprising that Dr. Young does not cite to any literature for this protocol, because there is nothing scientific about it. This method of recording, collecting, and analyzing the data is entirely unreliable, and undermines Dr. Young's conclusions. *See Cabrera v. Cordia Corp.*, 134 F.3d 1418, 1422 (9th Cir. 1998) (excluding expert who "provided no explanation of 'precisely how [he] went about reaching his conclusions' regarding the accuracy of his testing measure, and could not 'point to some objective source . . . to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field.'" (quoting *Lust ex rel. Lust v. Merrell Dow Pharms. Inc.*, 89 F.3d 594 (9th Cir. 1996))).

Next, with respect to Study 2, Dr. Young did not provide any academic or scientific explanation as to why the results of just three participants were sufficient to render his methodology and conclusions reliable—his only reason for using just three participants for Study 2, in fact, was that "[they] didn't have enough time to do a full study with more individuals." Pl. Ex. QQ at 139:3-10. Dr. Young further testified that Study 2 "captures essentially the same kinds of information that we describe in Study 1," and that, because "these same trends are very similar to what we saw in the first study, [he did not] see any reason why this data set cannot also supplement that first study." *Id.* at 139:7-140:8. But he provides no basis for his conclusion that observing only three participants is scientifically sufficient to "supplement that first study."

Notwithstanding the methodological deficiencies, the data does not support Dr. Young. He has no basis to conclude that, "We found no evidence that buckling

or unbuckling times were atypical in the Honda CR-V in any of the configurations, as compared to other test vehicles" (Pl. Ex. WW at 13, 16), because his own data from his studies show just the opposite: contrary to his Report's written conclusions, the data indicate that the crossed-belt configurations in the CR-V, Rogue, RAV4, and Equinox consistently required more time to buckle and unbuckle when the center rear occupant position was occupied and the seat belt in use.

For example, the difference between buckling with an empty middle seat versus a child care seat in a Forester was 11%, but in the Class Vehicle, the difference was *91%*.  Pl. Ex. QQ at 123:15-125:15l Pl. Ex. II ¶ 10. In fact, in *every* vehicle with the crossed-belt configuration, it took participants longer to buckle and unbuckle in all conditions than it did in the vehicles with the uncrossed-belt configurations (the Forester and Escape).  Dr. Young inexplicably maintains the position that these percentage differences do not constitute a "material difference" but *could not point to any metric* whereby a time differential *would* constitute a "material difference," in his opinion.  *See id.* at 131:2-24.  This is because, as set forth above, Dr. Young has employed no academic, scientific, or industry methodology in analyzing and reporting his data.  Moreover, Dr. Young cannot support his conclusions with experience in seat belt design and safety, and he is unable to identify any specific academic, scientific, or industry literature to support his methodology.  His conclusions are, therefore, unreliable and should not be given any weight.

As Dr. Young's data makes clear, in all of the vehicles that had a crossed-belt configuration (the CR-V, Rogue, RAV4, and Equinox), study participants took longer to buckle and unbuckle their seat belts than they did with the Forester and Escape, which have uncrossed-belt configurations.  Pl. Ex. II. ¶ 10.  Dr. Young included vehicles with crossed-belt and uncrossed-belt configurations in his

studies, but other than collecting the data, he conducted no analysis whatsoever comparing the averages of the timing differentials between the crossed-belt vehicles and the uncrossed-belt vehicles, specifically.  Pl. Ex. QQ at 112:16-25. Had Dr. Young done so, the data clearly shows that the crossed belts significantly increase the time to buckle and unbuckle, even in the ideal environment of his test conditions.  Pl. Ex. II ¶¶ 10-11.

Moreover, Dr. Young acknowledged during his deposition (but not in his Report) that he was aware that certain of the vehicles he chose for his studies have since undergone design changes to uncross the seat belt buckles, including the Rogue, RAV4, and Equinox.  Pls. Ex. QQ at 95:1-96:13. Thus, the CR-V is the sole vehicle he reviewed which still has the crossed buckle configuration.  Pl. Ex. II ¶ 6.  Not surprisingly, that critical fact was also ignored by Young in reaching his conclusions.

## II.    <u>Certain of Dr. Young's Conclusions Are Irrelevant Because They Do Not Pertain to Plaintiffs' Theory of the Case</u>

As noted above, Dr. Young's methodology purports to compare the Class Vehicle to "peer vehicles," but he does so without isolating the variable at issue— whether the seat-belt configuration is crossed, the defect in this case.  His analysis—if you can call it that—does not, then, pertain to the relevant issue: whether the defective *seat belt configuration* of the Class Vehicles renders them unable to safely seat three rear seat passengers.  Instead, it simply finds that other "peer" vehicles may suffer from a similar defect, which is unhelpful to the trier of fact and is, therefore, irrelevant.[4]

Dr. Young draws several additional conclusions in his Report, including

---

[4] Dr. Young even acknowledged during his deposition that certain of the "peer" vehicles he chose have since undergone design changes to uncross the seat belt buckles, including the Rogue, RAV4, and Equinox.  Pl. Ex. QQ at 95:1-96:13.

"[a]dult occupants can easily access and operate the safety restraints in the rear seat of the subject Honda CR-V with (and without) occupants or child car seats in the other seat positions."  Pl. Ex. WW at 26.  This conclusion, however, is irrelevant.  Dr. Young's conclusion does not even reach the defect as defined in Plaintiffs' Motion for Class Certification: that because of the defective seat belt configuration, the Class Vehicles cannot *safely* seat three passengers in the rear of the CR-V.  Mot. for Class Cert. at 1, 16.  Plaintiffs have not argued that three passengers cannot physically fit in the rear of the Class Vehicles, or that the safety restraints in the rear are inoperable simultaneously.  Plaintiffs' theory is that because of the defective seat belt configuration, simultaneous use of all three safety restraints in the rear of the Class Vehicles is *unsafe*.  Dr. Young's conclusion does not pertain to this theory, will not help the trier of fact, and is, therefore, irrelevant and should not be given any weight.

Likewise, Dr. Young concludes that "[p]assenger buckling behavior in the rear seat of the subject Honda CR-V is consistent with and similar to typical handling actions as well as across peer vehicles within its class."  Pl. Ex. WW at 26.  But, again, Plaintiffs do not allege that the defect at issue is that it is more difficult to buckle or unbuckle the seat belts in the Class Vehicles as opposed to comparator vehicles, and Dr. Young admitted as much during his deposition.  Pl. Ex. QQ at 35:13-36:22. Even if this conclusion were relevant, as set forth above, Dr. Young's data does not support this conclusion.

Dr. Young also draws the conclusion that "[b]uckling and unbuckling behavior in the subject Honda CR-V and its peers is related to individual characteristics and situational factors rather than vehicle design characteristics."  Pl. Ex. WW at 26.  This conclusion is irrelevant.  First, as discussed above, Plaintiffs do not allege that the Class Vehicles are defective as compared to other vehicles, and whether users have difficult buckling or unbuckling rear seat belts in

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D. CASE NO. 8:15-cv-01985 CAS (Ex)

15

vehicles other than the Class Vehicles has no bearing on whether the seat belt configuration in the Class Vehicles is defective.  Further, Dr. Young's discussion of handling actions and visual behavior, and the extent to which those principles are incorporated into his conclusions, is irrelevant.  *See id.* at 9-10 (discussing Ebert & Reed and Monnier, et al. buckling strategies).  While these human factors may impact the ***way*** in which users buckle or unbuckle their seat belts, those differences are reflected in the ***time*** it takes a user to do so. Those behaviors on their own, then, have no bearing on whether the seat belt configuration is safe.  Dr. Young discusses various hand placements and buckling strategies, but conducted no analysis to determine whether these various strategies make a difference in an average participant's ability to buckle or unbuckle their seat belts, and makes no connection between these varying strategies and the safety of the seat belt configuration.

These human factors variations[5] are further irrelevant because of how Dr. Young decided to report his data.  Dr. Young averaged the time each participant took to buckle and unbuckle themselves in each vehicle.  Because of that, there is nothing to suggest that any variation in hand placement, gaze, or other human factor resulted in faster or slower buckling or unbuckling for any given individual compared to another.  These observations, and conclusions that flow from them, are irrelevant and should not be given any weight by the Court.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court give

---

[5] Further, courts closely scrutinize human factors analyses, in part, because how malleable and subjective they are.  *See, e.g., Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1103 (W.D. Okla. 2009) (although human factors engineering is a legitimate discipline, in a forensic setting, the application of human factors invites close scrutiny as human factors principles can be highly subjective and thus conveniently malleable).

PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF EXPERT REPORT AND TESTIMONY OF DOUGLAS YOUNG, PH.D. CASE NO. 8:15-cv-01985 CAS (Ex)

16

little, if any, weight to Dr. Young's Report in connection with Defendant's Opposition, MSJ, or MTE Whitman.

Dated:     August 3, 2020                    SHEPHERD, FINKELMAN, MILLER
                                             & SHAH, LLP

                                      By:  /s/ Kolin C. Tang
                                             Kolin C. Tang
                                             1401 Dove Street, Suite 540
                                             Newport Beach, CA 92660
                                             Telephone: (323) 510-4060
                                             Facsimile: (866) 300-7367
                                             Email:  ktang@sfmslaw.com

                                             James C. Shah
                                             SHEPHERD, FINKELMAN, MILLER
                                             & SHAH, LLP
                                             1845 Walnut Street, Suite 806
                                             Philadelphia, PA 19103
                                             Telephone: (610) 891-9880
                                             Facsimile: (866) 300-7367
                                             Email:  jshah@sfmslaw.com

                                             Robert W. Murphy
                                             MURPHY LAW FIRM
                                             1212 SE 2nd Ave.
                                             Ft. Lauderdale, FL 33316
                                             Telephone (954) 763-8660
                                             Facsimile: (854) 763-8607
                                             Email:  rwmurphy@lawfirmmurphy.com

                                             Ryan R. Frasher
                                             THE FRASHER LAW FIRM, P.C.
                                             3209 W. Smith Valley Road, Ste. 253
                                             Greenwood, IN 46142
                                             Telephone (317) 300-8844
                                             Facsimile: (317) 218-4501
                                             Email:  rfrasher@frasherlaw.com

*Attorneys for Plaintiffs and the Proposed
Class*

## CERTIFICATE OF SERVICE

I, Kolin C. Tang, hereby certify that on the 3d day of August, 2020, the foregoing Notice Of Motion And Motion To Limit Consideration Of The Expert Report Of Douglas Young, Ph.D.; Memorandum Of Points And Authorities was served via electronic mail and ECF on the following counsel of record:

Michael L. Mallow (mmallow@shb.com)
Rachel A. Straus (rstraus@shb.com)
SHOOK, HARDY & BACON LLP
2049 Century Park East, Suite 3000
Los Angeles, CA 90067

*/s/ Kolin C. Tang*
Kolin C. Tang